# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

CRAFTSMEN LIMOUSINE, INC., et al., )
)
    Plaintiffs, )
) No. 98-3454-CV-S-DW
v. )
)
FORD MOTOR COMPANY, et al., )
)
    Defendants. )
)

# ORDER

Before the Court are Ford's motion to strike the affidavit of Craftsmen's expert John Scoggins (Doc. 745), Ford's motion to exclude the testimony of Craftsmen's expert John Scoggins (Doc. 748), Ford's motion for summary judgment (Doc. 727), and American Custom Coachworks' motion for summary judgment (Doc. 735). After careful consideration of the facts and law—particularly the appellate decision remanding this case for a new trial—the Court grants all four motions.

## I. BACKGROUND

Limousine manufacturers, Craftsmen Limousine, Inc. and JMRL Sales & Service, Inc. (collectively, "Craftsmen") sued several other limousine manufacturers and Ford for antitrust violations under section 1 of the Sherman Act. See 15 U.S.C. § 1.[1] Craftsmen alleged that the

---

[1] Craftsmen also sues under Mo. Rev. Stat. § 416.031(1). Under Missouri law, Craftsmen's state antitrust claims must be construed in harmony with comparable federal claims. See Mo. Rev. Stat. § 416.141. Summary judgment on the federal claims mandates judgment on the state claims. See Alphae Shoe Serv. v. Fleming Cos., 849 F.2d 352, 353 (8th Cir.), cert. denied, 488 U.S. 942 (1988).

defendants conspired to prevent it from advertising in the limousine industry's two trade publications, and from attending trade shows.[2]  The case was tried to a jury in 2002.  After the magistrate judge ruled that the alleged restraint was a "per se" antitrust violation, the jury returned a verdict for Craftsmen.  Holding that a "per se" analysis was improper, the Court of Appeals for the Eighth Circuit reversed in part and remanded for a new trial.  See Craftsmen Limousine, Inc. v. Ford Motor Co., 363 F.3d 761, 777 (8th Cir. 2004).  Instead, the case must be analyzed under the "rule of reason," where "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect."  Id. at 772-73 (8th Cir. 2004).

The Court of Appeals also held that, on remand, Craftsmen's expert testimony would not be admissible under Federal Rule of Evidence 702:

> Cole's testimony did not sufficiently aid the jury in determining whether there was an "unreasonable" restraint on trade in violation of the Sherman Act.  Cole *assumed* that Craftsmen's alleged lost growth from 1995 through 1998 was caused by defendants' alleged conspiracy.  He did not determine whether other factors, including the emergence of two direct competitors, may have affected Craftsmen's growth rate. . . .  Because Cole's expert opinion failed to "incorporate all aspects of the economic reality," it should not have been admitted.

Craftsmen, 363 F.3d at 777 (citation omitted).  On remand, Craftsmen hired expert John Scoggins to formulate a new opinion.

After discovery, Ford moved for summary judgment, arguing that Craftsmen ignored the

---

[2]The factual background of this case is presented at length in Craftsmen Limousine, Inc. v. Ford Motor Co., 363 F.3d 761, 763-71 (8th Cir. 2004), and is not repeated here.

Eighth Circuit's mandate. It asserts that Scoggins never analyzed whether the alleged restraints were unlawful, as required by the rule of reason. Opposing summary judgment, Craftsmen submits an affidavit from Scoggins. Ford moves to strike Scoggins's affidavit, arguing it is an attempt to create a "sham" issue of fact to avoid summary judgment. Ford also moves to exclude Scoggins from testifying under Federal Rule of Evidence 702, contending he cannot formulate an admissible rule-of-reason opinion. On October 28, 2005, this Court held a Daubert hearing on Ford's motion to exclude Scoggins's testimony. John Scoggins testified, with examination by Craftsmen's counsel, Ford's counsel, and the Court. The Court also heard oral argument on Ford's motion to strike Scoggins's affidavit.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences from those facts are viewed in the light most favorable to the nonmoving party. See Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-90 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. See id. The applicable substantive law identifies which facts are material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine material issue exists when the evidence is such that a reasonable jury could return a verdict for the nonmovant. See id. at 249-50.

When the nonmovant has the burden of proof at trial, the movant may carry its burden at summary judgment by demonstrating the absence of an essential element of the nonmovant's claim.  See Celotex, 477 U.S. at 325.  The moving party is not required to produce evidence showing the absence of a material fact on such issues, nor must the moving party support its motion with evidence negating the non-moving party's claim.  See id.; Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the opposing party to produce "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir.), cert. denied, 522 U.S. 816 (1997).  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.  Thus, summary judgment is appropriate in cases where the party bearing the burden of proof at trial has not presented any admissible evidence on an essential element of her claim.  See, e.g., Sorensen v. Shaklee Corp., 31 F.3d 638, 650-51 (8th Cir. 1994) (affirming summary judgment where plaintiff's only causation evidence was held inadmissible under Rule 702).

### III.  SECTION 1 LAW: THE RULE OF REASON

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  "Despite its broad language, Section 1 has long been interpreted to outlaw only those restraints that are 'unreasonable.'"  Craftsmen, 363 F.3d at 772.  "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress

4

or even destroy competition." Chicago Bd. of Trade v. United States, 246 U.S. 231, 238 (1918).

Under the rule of reason—which controls here—"the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." Craftsmen, 363 F.3d at 772. A rule of reason analysis focuses on the alleged restraint's effect on competition, not on harm to an individual plaintiff. See Nat'l Ass'n of Review Appraisers & Mortgage Underwriters, Inc. v. Appraisal Found., 64 F.3d 1130, 1135 (8th Cir. 1995) ("The Associations' claims of harm to the market reflect mere individual harm."), cert. denied, 517 U.S. 1189 (1996); see also T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 635 (9th Cir. 1987) (party cannot withstand summary judgment motion in absence of evidence of harm to competition). Thus, if a claim "does no more than state plaintiff's commercial disappointment" at losing business, it "is insufficient as a matter of law to rise to the level of an antitrust violation within a relevant market." Double D Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 561 (8th Cir. 1998); see also Flegel v. Christian Hosp., Northeast-Northwest, 4 F.3d 682, 689 n.6 (8th Cir. 1993) ("A jury could not reasonably find based on these affidavits that the denial of privileges to Flegel and Still by Christian has caused actual detrimental effects to competition (to Flegel and Still, perhaps, but not to competition)."); cf. Dial A Car, Inc. v. Transp., Inc., 82 F.3d 484, 486-87 (D.C. Cir. 1996) ("While Dial a Car alleges injury to itself, that injury involves only one specific competitor and is insufficient to support a finding that the market as a whole is or will be injured.").

"Injury to competition requires proof either of market power in a relevant market, or of an

actual adverse effect on competition." Brookins, 219 F.3d at 852 (citing FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61 (1986); see also Flegel, 4 F.3d at 688. "Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for actual adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects." Indiana Fed'n of Dentists, 476 U.S. at 460-61 (internal quotations omitted); see also Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp., 208 F.3d 655, 662 (8th Cir. 2000) ("[P]laintiffs have failed to prove actual adverse effects on competition in that market, such as increased prices for anesthesia services, or a decline in either the quality or quantity of such services available to surgery patients."). Isolated statements of consumer preference "are not a sufficient 'empirical demonstration concerning the [adverse] effect of the [defendants'] arrangement on price or quality,' to state a § 1 claim." K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 128 (2d Cir. 1995) (alterations in original) (quoting Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 30 n.49 (1984)).

Absent evidence of actual adverse effects on competition, a plaintiff may establish harm to competition by defining the relevant market and offering proof that the defendant has market power in that market. See Flegel, 4 F.3d at 688; Brookins, 219 F.3d at 854. "The relevant market consists of two parts—the product market and the geographic market. The relevant product market consists of the goods and/or services with which defendant's product competes. The relevant geographic market is the geographic area of effective competition in which the defendant's product is traded." Paschall v. Kansas City Star Co., 695 F.2d 322, 326 n.3 (8th Cir. 1982); see also Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327-28 (1961). A relevant
6

product market is composed of "commodities reasonably interchangeable by consumers for the same purposes." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956). "In determining whether two 'products' are in the same market, it is important to consider the cross-elasticity of demand between the products, i.e., whether consumers will shift from one product to the other in response to changes in their relative costs." SuperTurf, Inc. v. Monsanto Co., 660 F.3d 1275, 1278 (8th Cir. 1981); see also Brookins, 219 F.3d at 854 (newly-asserted narrower product market required proof of no cross-elasticity of demand). Importantly, a market's definition must be based on more than anecdotal evidence. See FTC v. Freeman Hosp., 911 F. Supp. 1213, 1220 (W.D. Mo.) ("While such non-empirical data may have some probative value as a starting point to evaluate this market, such data will not carry the FTC's burden. Informal, off-the-cuff remarks and anecdotal evidence concerning the marketplace are no substitute for solid economic analysis."), aff'd 69 F.3d 260 (8th Cir. 1995).

Market power is "the ability (1) to price substantially above the competitive level and (2) to persist in doing so for a significant period without erosion by new entry or expansion." 2A Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, Antitrust Law ¶ 501, at 86 (1995). In the Eighth Circuit,

> Market power may be shown by a firm's percentage of sales in the market, especially where there is a strong consumer preference for the firm's product (which decreases the competitive impact of substitutes) and where there are significant barriers either to the entry of new firms or to increased output by existing firms. On the other hand, direct evidence of competitive pressure—demonstrated by a significant number of viable competitors in the market, or by the entry of new competitors, or even by the product's price sensitivity—indicates a lack of market power. It is incumbent on the plaintiff to present evidence of defendant's power in the relevant market . . . .

7

Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215, 1232 (8th Cir. 1987) (citations omitted), cert. denied, 484 U.S. 1026 (1988). "A defendant who establishes, in accordance with the rules governing summary judgment, that it lacks market power a fortiori establishes that no genuine issue of material fact exists and is entitled to entry of judgment in its favor as a matter of law." Assam Drug Co. v. Miller Brewing Co., 798 F.2d 311, 317 (8th Cir. 1986).

## IV.   Scoggins's Econometric Analysis

Craftsmen asked Scoggins to analyze the impact of Defendants' "anticompetitive behavior" on Craftsmen's net income. Scoggins created a report including "(1) an analysis of the causes of the decline in Craftsmen's profits during the period of the anticompetitive behavior, and (2) our estimate of the economic damages Craftsmen sustained due to this behavior." Scoggins's opinion results, in part, from a multiple regression model. The model uses mathematical and statistical techniques to isolate the cause and amount of Craftsmen's alleged economic losses through hypothesis testing. Scoggins uses a single dependent variable (the variable to be explained) and several independent variables (variables thought to produce or be associated with changes in the independent variable). See Daniel L. Rubinfeld, Reference Guide on Multiple Regression, in Reference Manual on Scientific Evidence 181 (Federal Judicial Center 2000).

The dependent variable in the model is Craftsmen's sales. The independent variables are time, time squared, average price of Craftsmen limousines, base units of production, number of competitors, and a "dummy variable" called "antitrust indicator." Scoggins uses the number of competitors in the "specialty limousine" market to represent "competition." The total number of base chassis produced by Ford and General Motors represents "demand." Based on this model,

8

Scoggins finds that the coefficient for the antitrust indicator is statistically significant. He concludes that "the anticompetitive behavior reduced Craftsmen's sales during the 1995-1998 time span," and that the amount of such damage is $1,407,939.

## V. DISCUSSION

### A. Motion to strike Scoggins's affidavit

By Ford's interpretation, Scoggins admitted at deposition that he did not analyze the effect of the advertising and trade show restrictions; did not analyze the impact of the restrictions on competitors other than Craftsmen; and did not statistically analyze whether Ford had market power or any market share. In his affidavit (accompanying Craftsmen's opposition to summary judgment), Scoggins rejects that interpretation.[1] He states, for example, that he did analyze harm

---

[1] The affidavit states, in part:
    1. At the request of plaintiffs, I identified the relevant market, analyzed the effects of Defendants' anticompetitive behavior on the relevant market, and analyzed the injury to the plaintiffs. This analysis was done in conjunction with factors identified by the court in [Craftsmen].
    . . . .
    8. The Defendants' actions in denying specialty limousine manufacturers access to advertising in trade magazines and trade shows resulted in an exclusion of specialty manufacturers from the limousine market with a corresponding decrease in sales.
    9. The usefulness and admissibility of econometric models in antitrust litigation is well-documented. The econometric model I used to analyze the effect of Defendants' anticompetitive behavior took into account other factors affecting the demand for specialty limousines, including changes in the aggregate market demand for limousines and changes in the number of competitors in the specialty limousine industry. I later added the number of traditional limousine manufacturers, which changed little from year to year, to the econometric model. The addition of this variable did not change the results of the regression analysis.
    . . . .
    12. Based on interviews of individuals who work in the industry and an examination of the annual LCT fact books, we found no likely explanation for the drop in the demand of Craftsmen's limousines other than the anticompetitive behavior of Defendants. The conclusion applies to other specialty limousine

to the relevant market, that firms other than Craftsmen were harmed by the advertising restrictions. Ford argues the affidavit is an improper attempt to avoid summary judgment.

"[P]arties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment." Am. Airlines, Inc. v. KLM Royal Dutch Airlines, Inc., 114 F.3d 108, 111 (8th Cir. 1997); see also Marathon Ashland Petroleum, LLC v. Int'l Nat'l Bhd. of Teamsters, 300 F.3d 945, 951 (8th Cir. 2002); Wilson v. Westinghouse Elec. Corp., 838 F.2d 286, 289 (8th Cir. 1988); cf. Trost v. Trek Bicycle Corp., 162 F.3d 1004, 1008-09 (8th Cir. 1998) (affirming exclusion of expert testimony opinion submitted after disclosure deadline and filing of opening summary judgment brief). A sham issue of fact arises when a party (or its expert) contradicts its previous testimony. See American Airlines, 114 F.3d at 111.

The Court concludes that it will not consider the affidavit. See id. Under Craftsmen's own explanation—that the affidavit merely restates the report and deposition—it adds little to the Daubert equation. With Scoggins's report, deposition, and hearing testimony, the Court has ample information to assess his opinion.

**B.    Motion to exclude Scoggins's opinion**

Ford contends that Scoggins did not perform necessary analysis of competition in a relevant market to support a rule-of-reason opinion. Thus, Ford argues, Scoggins's opinion cannot aid the jury to understand the evidence or to determine a fact in issue, as is required for admissibility under Rule 702. The Court agrees, and grants Ford's motion to exclude the testimony.

---

manufacturers in the market during the applicable time period.
13.    Based on the evidence presented at the first trial of this matter, Defendant Ford possessed substantial power within the relevant market.

Federal Rule of Evidence 702 governs the admissibility of expert scientific testimony. The Rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588-95 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). Rule 702 requires a district court to ensure that expert evidence based on scientific, technical, or other specialized knowledge is "not only relevant, but reliable." Daubert, 509 U.S. at 589. For both elements, relevance and reliability, the district court's focus "must be solely on principles and methodology, not on the conclusions" of the expert. Id. at 595. The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology can be applied to the facts at issue." Id. at 592-93.

To determine whether proffered testimony is based on reliable scientific knowledge, district courts may evaluate such factors as: (1) whether the underlying scientific theory or technique has been tested; (2) whether it has been subjected to peer review and publication; (3) whether it has an acceptable known or potential rate of error; and (4) whether it is generally accepted in the relevant scientific community. See id. at 593-94. To determine whether proffered expert evidence is relevant, courts must examine whether the evidence or testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." Id. at 591.

Ultimately, the district court's inquiry must be a flexible one. See id. The court should make fact-specific determinations guided by overarching indicia of relevance and reliability. See id.

The Daubert analysis in this case is informed by the Eighth Circuit's decision. There is no per se illegal restraint. Craftsmen, 363 F.3d at 772-76. Craftsmen's expert must "formulate a new opinion using the proper standard under a rule of reason analysis." Id. at 777 n.16. The question before this Court is whether Scoggins's testimony will "sufficiently aid the jury in determining whether there was an 'unreasonable' restraint on trade in violation of the Sherman Act." See id. at 777. "To determine the legality of a restraint of trade under the rule of reason, one must focus on the detrimental effects to *competition* . . . ." Flegel, 4 F.3d at 688 (emphasis added). However, it appears that Scoggins assumes "anticompetitive behavior," and focuses only on Craftsmen's *individual* economic harm.[2] Therefore, his opinion testimony cannot assist a jury in determining harm to competition.

Scoggins's multiple regression tests only whether Defendants' "anticompetitive behavior" caused harm to Craftsmen. Although Scoggins uses an independent variable called "antitrust indicator" to represent alleged anticompetitive conduct, he never analyzes the alleged restraints—advertising and trade show restrictions—to determine if they were anticompetitive. In fact, Scoggins flatly and repeatedly denies the need for such analysis. During deposition, he

---

[2]The first paragraph of Scoggins's report states:
> You asked Research and Planning Consultants ("RPC") to provide an analysis of the impact of the anticompetitive behavior by Ford Motor Company and American Coachworks ("the defendants") on the net income of Craftsmen Limousine, Inc. ("Craftsmen"). This report includes (1) an analysis of the causes of the decline in Craftsmen's profits during the period of the anticompetitive behavior, and (2) our estimate of the economic damages Craftsmen sustained due to this behavior.

12

testifies: "I'm an economist, and on the face of it, an advertising ban is anticompetitive, so there was no need to do any kind of statistical analysis on that issue."[3] Dep. at 43. Scoggins confirms that answer at the Daubert hearing. Hearing at 101-02. Scoggins cannot opine that there was "anticompetitive behavior" without having analyzed whether the alleged restraints had an anticompetitive effect. Thus, his opinion that Defendants engaged in "anticompetitive behavior" is based only on his speculation that the restraints at issue were "anticompetitive," which "is not competent proof and contributes nothing to a legally sufficient evidentiary basis." Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir.) (internal quotations omitted), cert. denied, 531 U.S. 979 (2000); see also Meterlogic, Inc. v. KLT, Inc., 368 F.3d 1017, 1019 (8th Cir. 2004) ("The district court must exclude expert testimony if it is 'so fundamentally unreliable that it can offer no assistance to the jury.'"); Blomkest Fertilizer Inc. v. Potash Corp. of Saskatchewan, Inc., 203 F.3d 1028, 1038 (8th Cir.) (There must be "sufficient facts already in evidence or disclosed by the witness as a result of his or her investigation to take such expert opinion testimony out of the realm of guesswork and speculation."), cert. denied, 531 U.S. 815 (2000).

Scoggins's econometric analysis applies only to Craftsmen, not other competitors. Craftsmen asserts the economic analysis is supplemented by Scoggins's interviews with the owners of other specialty-limousine firms. At the hearing, Scoggins testified that he made many phone calls to firms that had gone out of business, or that refused to assist in this litigation. The Court appreciates the difficulty in acquiring data from competitors. But the fact is, Scoggins's

---

[3]The Court notes the Eighth Circuit's opinion that "the alleged restraints were arguably based, at least in part, on safety concerns." Craftsmen, 363 F.3d at 776.

13

only other "analysis" comes from a telephone conference with the owner of Legendary Coachworks, who said that Legendary's sales decreased and she thought it was because of advertising. Hearing at 91-94. These "informal, off-the-cuff remarks" add little to the econometric analysis. See Freeman Hospital, 911 F. Supp. at 1220. Without more, Scoggins's analysis of Craftsmen cannot fairly be extended to an opinion of harm to competition in a relevant market.

In interrogatory answers, Craftsmen defines the relevant market as all limousines manufactured by all coachbuilders and manufactured from any type of base unit. Scoggins does not follow that definition. Instead, he defines the relevant market as "specialty limousines" (stretched more than 120 or 130 inches), specifically excluding "traditional limousines" (stretched 120 inches or less). Scoggins offers no analysis to support "specialty limousines" as a relevant market. He does not analyze the "reasonable interchangeability" of "specialty" and "traditional" limousines to determine whether those products were substitutes and whether they exhibited a high cross-elasticity of demand from buyers. See du Pont, 351 U.S. at 395; Brookins, 219 F.3d at 854. Scoggins admits that "specialty" and "traditional" limousines are substitute products, but, with little explanation, says they are not "close substitutes." Dep. at 52-53. In short, Scoggins's relevant market definition contradicts the definition initially asserted by Craftsmen, and is not supported by any empirical evidence. See Brookins, 219 F.3d at 854; Freeman Hospital, 911 F. Supp. at 1220. This definition—a linchpin of Scoggins's entire opinion—cannot aid the jury to understand the evidence or to determine a fact in issue.

Unlike the expert at the first trial, Scoggins did consider other factors that may have affected Craftsmen's growth rate. See Craftsmen, 363 F.3d at 777. He may have attempted "to

14

formulate a new opinion using the proper standard under a rule of reason analysis." See id. at 777 n.16. However, this Court concludes that the expert opinion does not "sufficiently aid the jury in determining whether there was an 'unreasonable' restraint on trade in violation of the Sherman Act." See id. at 777. Because Scoggins's opinion cannot "assist the trier of fact to understand the evidence or to determine a fact in issue," it is inadmissible under Rule 702. See Daubert, 509 U.S. at 589; Concord Boat, 207 F.3d at 1057.

   C.   **Defendants' motions for summary judgment**

Craftsmen's opposition to summary judgment relies almost entirely on Scoggins's opinion. Without his testimony, a jury has no sufficient basis from which to conclude that the advertising and trade show restrictions unreasonably restrained competition.[4] Therefore, Defendants' requests for summary judgment must be granted.

---

[4] Even with Scoggins's testimony as evidence, this Court questions whether Craftsmen can prove actual adverse effects on competition, or a relevant "specialty limousine" market and any defendant's power in any relevant market.

15

## VI. CONCLUSION

For the reasons stated, the Court hereby

GRANTS Ford's motion to strike the affidavit of Craftsmen's expert John Scoggins (Doc. 745);

GRANTS Ford's motion to exclude the testimony of Craftsmen's expert John Scoggins (Doc. 748);

GRANTS Ford's motion for summary judgment (Doc. 727); and

GRANTS American Custom Coachworks' motion for summary judgment (Doc. 735).

SO ORDERED.

                                                                       /s/ DEAN WHIPPLE
                                                                            Dean Whipple
                                                             United States District Judge

Date: December 1, 2005